And we will move to our second case this morning, which is United States v. Soybel. And we have a split argument this morning for the appellant, Mr. Soybel. Beginning with Ms. Coburn. Hi, this is Ms. Coburn on the line. You may proceed. May it please the court. My name is Elizabeth Coburn, and I am a recent graduate participating in Notre Dame Law School's appellate moot court program under the supervision of Attorney Robert Palmer. I, along with my co-counsel, Henry Wieman, represent the appellant, Edward Soybel. I will be addressing appellant's claim that the Penn Register Act, as applied to IP address connections, violates the Fourth Amendment, and my co-counsel will address the damage issue. Your Honors, the decision of the lower court to deny the motion to suppress Penn Register evidence should be reversed. The Internet is constitutionally distinct from telephones in a way that makes this case significantly more analogous to Carpenter than Smith. And because of these distinctions, individuals have a reasonable expectation of privacy in their IP connections. IP connections are meaningfully different from telephones and similar to cell site location information in terms of two related categories of criteria. First, the pervasiveness and method of usage. And second, the quality and quantity of usage. To my first point, the Internet today is constitutionally distinct from telephones of the analog era because it is, one, used almost constantly and for a massive variety of tasks, and two, used without much action on the user's behalf. These differences render the third party doctrine inapplicable. Carpenter held that the third party doctrine does not apply to all conveyances of data to a third party, especially in the digital age. In Carpenter, the conveyance of cell site location data to a person's cell phone provider was not truly voluntary because of the pervasiveness and method of cell phone usage. Judge St. Eve, do you agree that the Penn Register information here only recorded IP addresses and routing information? In other words, you're not arguing that it recorded any content, are you? No, Your Honor. We acknowledge that the Penn Register here picked up IP address connections, which is a set of four numbers separated by decimal points. However, we argue that because that information can be readily converted into the name of a website, the name of a website should be considered content itself. How would that differ from a phone call, for example? If you're using a Penn Register on a phone and you get numbers that were dialed out, you could quickly trace that number and find out if it was a bookstore or a restaurant or who it belonged to, similar to the IP addresses. So how do you distinguish that? Your Honor, we have two responses. The first speaks to the pervasiveness of usage. Telephones were certainly used frequently when Smith was decided, but nowhere near as often as the Internet is used today. Over 80% of adults say they use the Internet almost constantly. It can be used day or night, weekday or weekend, on holidays. It's always available as a limitless repertoire of information, unlike telephones, which must be manned by individuals. Well, where would you put cell phones in there? Cell phones today are – I don't have the data or the numbers, but I think it's a hard argument without that data to say that the Internet is used more than cell phones. And cell phones still fall under Smith. Yes, Your Honor, but that's only when people are making phone calls with their cell phones. Our argument is that people are using the Internet in a way that is qualitatively different from the way people are making phone calls. Does your pervasiveness argument, though, still stand with respect to cell phone use versus Internet usage? And if so, what are you basing that on in the record? Your Honor, the pervasiveness argument is just one part. Although people certainly use their cell phones to make calls, people also use their cell phones to conduct Internet business frequently. And the quality of that Internet communication is very different from phones. We acknowledge that there's little telephones can do that the Internet cannot do. Both can be used for various tasks, including communication. However, there are many things people use the Internet for that cell phones cannot be used for. And perhaps more important, even for things people could use the phone for, they often don't due to the comfort and convenience of the Internet. For example, people use the Internet to consume news, read product reviews, engage in entertainment, and visit niche forums. But if the pen register didn't record any content, which I think you agreed at the beginning it didn't, that it only recorded the IP address and the routing information, if it doesn't record content, then why does this argument matter for purposes of the Fourth Amendment analysis? Your Honor, it matters especially in light of Carpenter. Although the pen register does not pick up the actual content or the webpages a person is visiting or what an individual Googles, there are over 1.5 billion websites on the Internet today. And people can visit hundreds of them in a given day. When a thought nearly crosses someone's mind, they can use the Internet more as an information library than as a communication tool. The name of a website itself is capable of revealing a significant amount of content. Psychologically, this is... But do you get the name? Again, the pen register doesn't give you the name of the website. The pen register gives you an IP address and routing information. You would have to take the next step to find the name of the website. Just like a pen register on a phone, you would have to take the next step to find out who the particular phone number that you were calling belonged to. And that's still covered under Smith. It's true that the government would have to take the additional step to look up the website associated with the IP address. But first, this is not a very onerous step. Anybody can look up IP address information easily on the Internet and reverse engineer it to a domain name. Additionally, in Carpenter, cell site location data is generally communicated as a set of latitudinal and longitudinal coordinates. On a space, this doesn't tell anyone anything about where a person is located. The government would have to go through the extra step of looking up this information and translating it into GPS coordinates. But the Supreme Court made clear in Carpenter that the problem with that is that individuals have a reasonable expectation of privacy in their physical movements. And the ability to look up those coordinates enabled law enforcement to track their physical movements. Which is very different than being able to work backwards and figure out what sites you're going to. Your Honor, it's true that an individual has an independent privacy interest in the catalog of their geolocations as noted in Smith. But in the modern era, there is little constitutional difference between where a person goes physically and where they go virtually. This couldn't be truer than now during a pandemic. Additionally, we argue that Carpenter was less about an individual's physical location and more about what that location is capable of reviewing. What in the language of Carpenter do you base that argument on? Because the Supreme Court was pretty specific that Carpenter was narrow and they really emphasized the whole of an individual's physical movements. They didn't say movements, they said physical movements. Yes, Your Honor. But the court also said that they do care about what that location is capable of reviewing about a person's personal, professional, religious, and sexual associations. The privacy interest in these associations is really the underpinning of the Fourth Amendment. And it is true that Carpenter was narrow, but the door was left open for other forms of modern technology. Prior to the court's decision in Carpenter, cell site location data itself fell squarely under the third-party doctrine. And failing to consider Carpenter here is failing to acknowledge the realities of modern life. Additionally, Carpenter explicitly states that his holding does not disturb conventional surveillance techniques. And it gives the example of security cameras in particular. By naming what it does not disturb, Carpenter seems to acknowledge that at least some forms of novel technology beyond Carpenter are suspect. Ms. Coburn, has any circuit court agreed with your interpretation or expansion of Carpenter's IP addresses? I haven't found any, but I know some have rejected it, but have any agreed with your interpretation? No, Your Honor. There have been no cases that have assessed a set of facts analogous to ours and extended Carpenter beyond location information. However, all of the post-Carpenter cases cited by the government are factually distinguishable in that they deal with a person's privacy interest in a location capable of being revealed by their own IP address. We are asking the court to extend Carpenter beyond physical location information and into the realm of IP connections without any consideration of what an individual's own IP address reveals about their physical home address. Post-Carpenter, the third-party doctrine becomes just one consideration in a larger balancing test rather than a dispositive factor. And here, this consideration weighs in our favor. Applying the holding of Smith to a case like this based solely on the fact that they both deal with pen registers would be like saying a car is the same as a spaceship just because they are both forms of transportation. The question now becomes whether individuals have a reasonable expectation of privacy in their IP connections, which brings me to my second point. IP connections are also constitutionally distinct because they are capable of revealing significantly more personal information than telephones. And they also generate a massive amount of data that was unforeseeable when Smith was decided in 1979. Your time has long since expired. I did not want to interrupt you as you were answering Judge Staney's questions, so I didn't give you the warning. But if you could conclude in a few sentences so we can move to your co-counsel. Yes, Your Honor. At its core, if cell phones are considered an extension of an individual's self, IP connections should be considered an extension of an individual's mind and are certainly deserving of Fourth Amendment protection. And if there are no additional questions, I'll pass on to my co-counsel. Thank you. Mr. Lehman. Good morning. May I please the court? You may proceed. My name is Henry Lehman, and on behalf of the appellate, Mr. Edward Soygill, I'll be addressing the sufficiency of evidence issued. We're asking this court to reverse the conviction under Count 10 of the indictment because no rational jury could have found the element of damage, once properly interpreted, beyond a reasonable doubt. Now, in Count 10 of the indictment, the government alleges that on September 17, 2016, Mr. Soygill caused damage by using the Forget My Password function to change one employee's password on the server. For your honors, no rational jury could have found this to be damage for two reasons. First, while the definition of damage means any impairment to the integrity or availability of data, under the CFAA, deletions of data by themselves do not show damage if the data is still easily available elsewhere. And second, no matter what variable the government puts in Section 1030E8, any data affected on September 16th was still easily available elsewhere, and thus, as a matter of law, cannot be damaged. For those reasons, we're asking this court to reverse that conviction. Turning to our first point is an issue of statutory construction. While Section 1030E8 does have the broad language of any, it's narrowed by the verb impair. This has been recognized both in the case law, looking at the cases like Instant Technology and Cheney, where considerably more information was deleted, but it was not considered to be damaged because the owner of the protected computer could still access the data through other means, in Instant Technologies, through other folders. This principle becomes clearer also when looking at the text and structure of the statute. You'll notice that in Section 1030E8, the verb Congress uses, impair, as opposed to alter or modify, which they used in other provisions. Impair imposes a higher threshold level of harm. It implies because it is defined as some kind of weakness or diminishment, as opposed to modification, which doesn't require any harm in and of itself. Thus, because the verb impair applies a minimum level of harm, one way to determine if that harm is met is by seeing if the data is easily available elsewhere. Moreover, Your Honor, the government... Mr. Lehman, this is Judge Sandy. How do you respond to the government's argument that the evidence showed that the defendant impaired the integrity of the system by adding Hone's username to network security groups? Your Honor, you don't believe... Which would not be available outside. Your Honor, there was little evidence of the trial record, and no rational jury could have found that to be damaged because it ultimately did not have very much presence in the trial. So do you agree that that would be a sufficient basis to meet the legal test, but there just wasn't enough evidence? Is that what your argument is? That's correct, Your Honor. And that it wasn't a big part of the trial because whenever the government talked about September 17th, that trial, in Mr. Sherlock's testimony, in Mr. Hyde's testimony, in Mr. Weisman's testimony, the entirety was focused on the password change and then pivoting to other things. At no point did the government expressly focus on those changes to security groups, and in closing argument, Ms. Pillay recapped the September 17th event and only focused on changing the password and how that password hindered Mr. Hone's access. This principle, Your Honor, is also clear just from the nature of the statute in that the government could have used other provisions such as Section 1030-A2C or 1030-A6. The definition of damage does not need to stretch this far. Once we see this principle, Your Honors, it applies squarely to today's case. The Heapstock system was not impaired in such a way that it then became unavailable. The password change only changed the single cell of information. That was Mr. Hone's password change. And to Granger, the information was still easily available elsewhere. There's no evidence in the record that it prohibited their consumers or any other employees from accessing it. And the government seems to acknowledge this by pointing to that the only effect that the password change had was it impaired Mr. Hone's access to the Heapstock system for a limited period of time. Mr. Lehman, Mr. Judge Sykes, where on the statutory language do you get this distinction between impairment that consists of consumers' accessibility to the system and impairment that consists of Mr. Hone's accessibility to the system? Your Honor, we don't see a distinction in that sense. We mention that in our briefs because it's important to understand what the targeted or affected data or system is. Because the statute's worded to apply to any data system or information, we have to try to figure out, well, what is the government pointing to as the impaired system? We think of the consumer-facing versus non-consumer as a way of distinguishing parts of that data or system. Once we can rule out the consumer-facing stuff, we know that was not effective. We only narrow down on the specific thing the government points to, which was that the individual password may have been impaired. But, Your Honor, that password was also easily available elsewhere. All right. Your time has expired, Mr. Lehman, if you'd like to wrap up in a sentence or two. Yes, Your Honor. For those reasons, Your Honors, we're asking you to reverse the conviction under count 10. Thank you. Thank you. Mr. Eikensear. Thank you, Your Honors. May it please the Court, Nick Eikensear on behalf of the United States. The District Court correctly denied the defendant's suppression motion because the defendant did not have a reasonable expectation of privacy in the IP addresses that his apartment connected to. So the government did not need a probable cause warrant to obtain those records. And whether you analyze the defendant's suppression motion under the third-party doctrine or other Fourth Amendment jurisprudence, I think the threshold question is the same. Did the defendant have a reasonable expectation of privacy in the IP addresses that he transmitted to his Internet service provider? And the answer to that question is no, for the same reason that the Supreme Court held that telephone users have no privacy interest in the telephone numbers they dial and share with a phone company. Now, like phone numbers, IP addresses are essentially device identifiers. It's important to remember what IP addresses are not as well. It's not photos, emails, clicks, likes, posts. It doesn't reveal the URL or webpage you're visiting. It doesn't reveal what you look at on a webpage. All it reveals is the fact of an Internet connection. And, in fact, an IP address is just that. It's an address. It's a sequence of letters and numbers that are assigned to every device on the Internet so that those devices can exchange information. And IP addresses are, in fact, the linchpin of the public Internet in the same way that street addresses and phone numbers are the linchpins of the postal and phone networks. Without a street address, you can't send or receive a package. Without a phone number, you can't send or receive a text or phone call. Without an IP address, you can't send or receive basically anything over the Internet. Mr. Eikens, this is Judge St. Eve. Everywhere Wireless had an express policy that the defendant cited and brought out regarding his reasonable expectation of privacy, saying that they wouldn't share this information, the IP address information. Why doesn't that impact the Fourth Amendment analysis here? Well, Your Honor, I think the privacy policy would affect the Fourth Amendment analysis just in general because the subjective… It would or would not? I'm sorry. I didn't hear you. I'm sorry, Judge. It would. I think in a vacuum because the user's subjective expectation of privacy is part of the Fourth Amendment analysis. But here I think the policy that Everywhere Wireless had said, we will not track or monitor your online browsing activity. That was we referring to the Internet service provider. It didn't say anything about, you know, we wouldn't comply with a court order requiring us to turn over your IP connection records. It just simply said that Everywhere Wireless itself is not monitoring your Internet activity. So I think that there's a factual distinction between a policy that says, you know, we're not… We at ISP are not monitoring your Internet activity versus a policy that says we will not, you know, cooperate with law enforcement or turn over or keep track at all of your IP address activity. And so for the reasons I just explained about IP addresses, it makes sense that users of a public network like the Internet shouldn't have a reasonable expectation of privacy in the IP addresses that they need to send or transmit to their Internet service provider in order to connect to the Internet. And the Second Circuit took a very hard look at the exact type of IP registers at use in this case. And that was the Silk Road case, and the opinion was Albrecht a few years ago. And in that case, the Second Circuit found that the IP pad registers were constitutionally indistinguishable from the phone pad registers that were approved in Smith v. Maryland. And the court was fully cognizant of the differences between the Internet and the analog telephone area. And the government doesn't dispute that the Internet is more ubiquitous and pervasive in daily lives than telephones possibly were. But the question is still… the focus is what… it's not what is the Internet in general, it's what is the government collecting about a user's Internet activity. And again, the Second Circuit found that collecting… just recording the fact of a connection without any content makes the pad registers the same from a Fourth Amendment perspective as traditional telephone pad registers. And the government would respectfully urge this court to follow the Second Circuit's lead on that. Now, of course, the defendant argues that you should analyze this case or his suppression motion under Carpenter. But Carpenter just doesn't apply here. The court itself called that holding a narrow one. And it focused on a wholly different category of information, which was cell site location information from a cell phone user. And more importantly, the court in Carpenter left the third party doctrine and Smith v. Maryland intact. And really, the touchstone of Carpenter was the person's right to privacy in their physical movement. And that privacy right is just not implicated here. The devices the FBI used, they weren't tracking devices of any significant sense of the word. They were located in the mechanical room of the defendant's apartment building. They didn't reveal his location or his movements other than they may have incidentally revealed that he happened to be home if there was connections coming off of the pen. So these are key fact differences between the pervasive, comprehensive dossier of physical movement location at issue in Carpenter and IP pen registers here. And so I think based on those factual reasons, it's not surprising that courts, including the First Circuit and others, have unanimously declined to apply Carpenter outside the narrow context of cell site location information. And in fact, have declined to apply it to the types of IP address information at issue here. And the good faith exception to the warrant requirement is an alternative basis to affirm the district court's denial of suppression motion here. And as Judge Kennelly pointed out, this is precisely the type of case for which that exception was created. The government did everything it had to do under a statutory framework that allowed it to obtain this information without a warrant, which is the Pen Register Act. It submitted an application. It certified relevance. It obtained a court order. And in certifying relevance, it didn't just parrot the language of the statute. It did set forth some facts, explain facts about the victim company, Granger, about the defendant's former employment there, about the connection between the IP address for the building and the previous hacking incident. In short, the government acted in good faith. And it shouldn't be penalized for complying with a statutory framework that had been in force and relied on by law enforcement for years. And indeed, this court's recent opinion in Curtis is on point, if not dispositive here, because the facts that were analogous to this. Coincidentally, that case involved Carpenter, too, and cell site location information. And in that case, this court held that the government should have got a warrant to obtain the cell site location information in light of Carpenter. But the court declined to suppress those records because the government obtained them before Carpenter was issued and by relying on the Stored Communications Act, which allowed the government to obtain that information without a warrant. That's what happened in this case, too. The government obtained these records pursuant to the Pen Register Act. There was no case law, much less controlling case law, calling the constitutionality of the Pen Register Act into question. So the good faith exception to the warrant requirement should apply here. And finally, the defendant's conviction on count 10 should be affirmed. And that's because there was ample evidence for a rational juror to find that the defendant caused damage. When at 2.13 in the morning, he hacked into Grainger's secure servers and changed the password of a high-level Keepstock support analyst. The statutory definition of damage is broad and short. It's any impairment to the integrity or the availability of data, a program, a system, or information. And the jury was properly instructed on that definition. And the jury reasonably concluded from the trial evidence that the government met its burden of showing damage. And there are several ways that the government did this. The first was that the jury could have easily concluded that by resetting a high-level employee's password, the defendant essentially froze that high-level employee out of the system. And I say that because the jury heard evidence about this employee, that he was a top-tier network support analyst. He was issued a Grainger laptop that he was allowed to take home with him and work remotely, presumably to help troubleshoot issues with the network that might arise outside of business hours or when he's at home. After all, there were tens of thousands of users on this network. And so it makes sense that the jury would infer that when the defendant reset this top-tier employee's password without permission early in the morning, that that conduct locked that employee out of the system. It impaired the availability of Keepstock to that employee. Another way that a jury could have found damage here is they could have found that the defendant's conduct impaired the integrity of the data. Because the jury heard lots of trial evidence that Grainger maintained large databases that stored all the username and password combinations for the Keepstock employees. And those databases also stored the privileges or access rights for each employee. In other words, whether an employee had full or restricted access to the database. And in light of all that, a jury could have found that by resetting the top-tier analyst's password to 1234 and then adding that employee's username to various security groups, the defendant did more than just delete a password. He's now doctoring data. He's altering the data in a secure Keepstock, secure Grainger servers. How do you respond to Mr. Lehman's argument that there wasn't sufficient evidence of that? I agree that the government did not highlight that theory at trial. At closing, the government did focus on the locking Mr. Haney out of the network as the damage. But the jury was presented with an exhibit, albeit it was a large exhibit. And at the end, in a couple lines of the exhibit, it showed, and there was a forensic, FBI forensic technician that testified about this exhibit and how it was created and all the things that went into it, that showed that on September 17th, right after adding, changing the password to 1234, the defendant then added the username to these security groups. The government did not elicit testimony on that. The government did not argue that in closing, but the government did submit an exhibit showing that to the jury. So I would agree that the government did not highlight that information at trial, but I would not say that the evidence was insufficient for the jury to make that finding. So under either of those scenarios, under either the availability or the integrity prong, I think a rational juror could have plainly found that under either scenario, the defendant caused damage within the meaning of the statute. So unless the court has further questions, I'll end by asking you to affirm the defendant's conviction. Thank you. All right, thank you very much. Ms. Colburn, you have two minutes in rebuttal. Your Honor, Mr. Lehman will be conducting rebuttal. Mr. Lehman. Thank you, Your Honor. Two points on rebuttal dealing with the carpentry. The first is that Mr. Sloybal does maintain that the officer should have in good faith questioned the statute, but moreover, this court should not preemptively apply the good faith exception, because doing so would affirm the fears that this court stated in Curtis. In Curtis and Krull, the court acknowledged that litigants should continue to challenge the constitutionality of statutes, notwithstanding the good faith exception. Second, the government seems to focus largely on the idea that carpentry is narrowly focused on location information. But the real question to ask is, why location information brings in the Fourth Amendment? And the court sets that out early in their opinion. They note that the Fourth Amendment is designed to protect against the true privacies of life, and that the location records hold for many Americans the privacies of life. The IP content that is gathered through a pen register reveals the exact same privacies. While it is a stretch of numbers, those numbers can easily be converted into a domain name which is not content-neutral and does reveal those privacies. For those reasons, we are asking this court to reverse the motion to suppress, and in the alternative, reverse the conviction under count 10 of the indictment. Thank you. And our thanks to all counsel. The case is taken under advisement.